UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| MICHAEL R. MATHIOUDAKIS, <br>    *Plaintiff*, <br> <br>    *vs.* <br> <br> CONVERSATIONAL COMPUTING CORPORATION and STEPHEN RONDEL, <br>    *Defendants.* <br> _____ <br> <br> STEPHEN RONDEL, <br>    *Third-Party Plaintiff*, <br> <br>    *vs.* <br> <br> MICHAEL O'NEIL, <br>    *Third-Party Defendant.* | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) | 1:12-cv-00558-JMS-DKL |

## ORDER

Presently pending before the Court is Third-Party Defendant Michael O'Neil's Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(2). [Dkt. 40.] The Court conducted an evidentiary hearing on October 22, 2013, where it heard witness testimony and argument. [Dkt. 71.] For the following reasons, the Court finds that it has personal jurisdiction over Mr. O'Neil and denies the motion.

### I.
### BACKGROUND

**A. Second Amended Complaint Allegations**[1]

On April 26, 2012, Plaintiff Michael Mathioudakis filed a Complaint against Defendants Conversational Computing Corporation ("CCC") and Stephen Rondel, [dkt. 1], and subsequently

---

[1] The Court will discuss the evidence presented at the October 22, 2013 hearing in its discussion of the Motion to Dismiss.

filed the operative Second Amended Complaint on September 17, 2012, [dkt. 22]. CCC was a voice recognition technology company formed in approximately 2001. [*Id.* at 2, ¶ 7.] Mr. Rondel was the founder, Chairman, President, and Chief Executive Officer of CCC. [*Id.* at 1-2, ¶ 3.] Mr. Mathioudakis had several business clients who were shareholders of a venture capital fund which invested in CCC. [*Id.* at 3, ¶ 8.] In late 2005 or early 2006, Mr. Mathioudakis alleges that Mr. Rondel contacted him by telephone at least twice seeking a short-term loan for CCC. [*Id.* at 3, ¶ 9.] Mr. Mathioudakis alleges that Mr. Rondel told him on both of those occasions that a foreign citizen was investing more than a million dollars in CCC, and that Mr. Rondel had already received a wire transfer confirmation of those funds with a confirmation number from Chase Bank. [*Id.* at 3, ¶ 10.] Mr. Mathioudakis alleges that Mr. Rondel told him the wire transfer was delayed due to Patriot Act[2] regulations and that, as soon as the funds were received, the money loaned by Mr. Mathioudakis would be paid back. [*Id.*]

On or about April 28, 2006, CCC executed an Unsecured Promissory Note (the "Note"), which provided, among other things, that Mr. Mathioudakis would lend CCC $200,000, CCC would pay the loan in "one payment of all outstanding principal plus all accrued unpaid interest on May 29, 2006," and CCC would pay Mr. Mathioudakis a fee equal to ten percent of the total principal amount of the loan on May 29, 2006. [*Id.* at 3-4, ¶¶ 11-13; dkt. 22-1 at 1.] The Note also contained additional late charges and provided that Mr. Mathioudakis would be entitled to attorneys' fees and costs in the event CCC did not repay the loan. [Dkt. 22-1 at 1-2.] The Note is signed on behalf of CCC by "Stephen Rondel Chief Executive Officer." [*Id.* at 2.]

---

[2] The Patriot Act is the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Pub. L. No. 107-56, 115 Stat. 272 (2001), and was enacted shortly after the terrorist attacks of September 11, 2001. The Act, among other things, imposes heightened security standards for certain money transfers.

Mr. Mathioudakis alleges that, after entering into the Note and loaning the $200,000, he learned from CCC's Chief Financial Officer, Mr. O'Neil, that Mr. Rondel's representations regarding the foreign investor were false – that the foreign investor had never wired funds because he had decided not to invest in CCC, and that CCC had never received a wire transfer confirmation. [Dkt. 22 at 4, ¶ 15.] Mr. Mathioudakis alleges that he relied on Mr. Rondel's representations regarding the existence of a foreign investor and CCC's receipt of a wire transfer confirmation, and that he never would have entered into the Note and made the loan had he known those representations were false. [*Id.* at 4, ¶ 16.]

CCC did not pay the principal sum of $200,000 to Mr. Mathioudakis by the May 29, 2006 maturity date, nor did it pay the interest or fee due on that date. [*Id.* at 4, ¶ 17.] When Mr. Mathioudakis sent a demand letter to CCC for repayment of the Note, with accrued interest and other costs and fees, CCC made a partial interest payment of $80,000. [*Id.* at 4, ¶¶ 18-19.] CCC has not made any other payments, and Mr. Mathioudakis alleges that CCC became insolvent in 2010 or 2011. [*Id.* at 5, ¶¶ 20-21.]

Mr. Mathioudakis asserts a claim for breach of contract, alleging that CCC and Mr. Rondel have failed to pay the principal amount of the Note and other interest payments due. [*Id.* at 5-6.] He seeks the $200,000 principal amount, all outstanding and unpaid interest accruing at the rate of ten percent per month from April 28, 2006, late fees, and attorneys' fees and costs. [*Id.* at 6.][3]

### B. Allegations of the Third-Party Complaint

Mr. Rondel answered the Second Amended Complaint on October 11, 2012, and asserted third-party claims against Mr. O'Neil. [Dkt. 25.] Specifically, Mr. Rondel alleges that Mr.

---

[3] CCC has not appeared or otherwise participated in the lawsuit.

O'Neil was CCC's Vice President of Accounting and Finance, and was responsible for seeking out potential investors for CCC.  [*Id.* at 17, ¶¶ 3-4.]  Mr. Rondel alleges that Mr. O'Neil informed him in late 2005 that there was a foreign investor who was interested in investing two million dollars in CCC, and asked Mr. Rondel to make a presentation regarding CCC to the investor.  [*Id.* at 17, ¶ 6.]  Mr. Rondel made the presentation, and alleges that Mr. O'Neil subsequently informed him that the foreign investor had agreed to invest two million dollars in CCC and was immediately going to wire the funds to CCC.  [*Id.* at 17, ¶¶ 7-8.]

Mr. Rondel alleges that, based on the statements Mr. O'Neil made to him, he sought out a $200,000 loan from Mr. Mathioudakis, "reported to him what he had been assured by O'Neil was in fact the situation with respect to the investment by [the foreign investor] in [CCC] and stated that [CCC] would repay the loan once [the foreign investor's] investment was received." [*Id.* at 17, ¶ 9.]  Mr. Rondel claims that in May 2006, before the Note became due, Mr. O'Neil reported to him that the foreign investor was having trouble transferring the investment funds and was going to work with Chase Bank regarding completing the transfer.  [*Id.* at 18, ¶ 12.]  Mr. Rondel also alleges that Mr. O'Neil told him about the funds being held up by the Patriot Act, and that he had no reason to disbelieve that.  [*Id.* at 18, ¶¶ 13-14.]  He claims that he then told Mr. Mathioudakis what Mr. O'Neil told him regarding the delay.  [*Id.* at 18, ¶ 16.]  Mr. Rondel alleges that Mr. O'Neil told him in July 2006 that the foreign investor had changed his mind and was not going to invest.  [*Id.* at 18, ¶ 17.]

Mr. Rondel maintains that he never told Mr. Mathioudakis that he had a wire transfer confirmation from Chase Bank, and that if such a statement were made to Mr. Mathioudakis, it must have been made by Mr. O'Neil without disclosure to Mr. Rondel.  [*Id.* at 19, ¶¶ 20-22.]

Mr. Rondel claims that any statements he made to Mr. Mathioudakis were based solely on what he had been told by Mr. O'Neil. [*Id.* at 20, ¶ 28.]

Mr. Rondel asserts third-party claims against Mr. O'Neil for: (1) all amounts for which he is found to be liable to Mr. Mathioudakis; (2) breach of fiduciary duties owed to CCC and Mr. Rondel; (3) defamation; and (4) fraud. [*Id.* at 20.] Mr. O'Neil has moved to dismiss the third-party claims, arguing that this Court does not have personal jurisdiction over him. [Dkt. 40.][4]

## II.
### STANDARD OF REVIEW

"A federal court must obtain personal jurisdiction over a third-party defendant before it proceeds to adjudicate a third-party claim." *Andersen v. Sportmart, Inc.*, 57 F.Supp.2d 651, 656 (N.D. Ind. 1999). Once a defendant moves to dismiss a complaint under Fed. R. Civ. P. 12(b)(2) – as Mr. O'Neil has done here – the plaintiff bears the burden of demonstrating the existence of personal jurisdiction. *Purdue Research Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003); *see also Claus v. Mize*, 317 F.3d 725, 727 (7th Cir. 2003) ("The plaintiff bears the burden of showing that personal jurisdiction over the defendant exists"). Factual disputes, however, are resolved in the plaintiff's favor. *Turnock v. Cope*, 816 F.2d 332, 333 (7th Cir. 1987).

A court must have either general personal jurisdiction, specific personal jurisdiction, or jurisdiction by operation of a federal statute. Here, Mr. Rondel only asserts that the Court has specific personal jurisdiction, and concedes that the Court does not have general personal jurisdiction. [Dkt. 46 at 2.] Additionally, he has not argued that the Court has jurisdiction by operation of a federal statute.

---

[4] Mr. O'Neil filed his Motion to Dismiss while represented by counsel, but appeared at the evidentiary hearing relating to the motion *pro se*, and continues to proceed *pro se* as of the date of this Order.

A federal court sitting in diversity, as the Court does here, may exercise personal jurisdiction over a nonresident defendant only if a court in the state in which it sits would have such jurisdiction. *Nucor Corp. v. Aceros Y Maquilas de Occidente, S.A. de C.V.*, 28 F.3d 572, 579-80 (7th Cir. 1994). Accordingly, this Court must analyze whether an Indiana court would have jurisdiction over Mr. O'Neil through its long-arm statute. *Andersen*, 57 F.Supp.2d at 656. Indiana Trial Rule 4.4(A) serves as Indiana's long-arm provision and expands personal jurisdiction to the full extent permitted by the Due Process Clause. *LinkAmerica Corp. v. Cox*, 857 N.E.2d 961, 965-66 (Ind. 2006). Rule 4.4(A) provides "a handy checklist of activities that usually support personal jurisdiction but does not serve as a limitation on the exercise of personal jurisdiction" by Indiana courts. *Id.* at 967. Specifically, Trial Rule 4.4(A) states:

> Any person…that is a nonresident of this state…submits to the jurisdiction of the courts of this state as to any action arising from the following acts committed by him or her or his or her agent:
>
> (1) Doing any business in this state….

If a federal court determines that Indiana's long-arm statute would confer jurisdiction, it must then "engage[] in a second inquiry to determine whether the assertion of jurisdiction complies with constitutional due process standards." *Andersen*, 57 F.Supp.2d at 656 (citing *Wilson v. Humphreys (Cayman), Ltd.*, 916 F.2d 1239, 1243 (7th Cir. 1990)). To comply, the defendant must have purposefully availed itself of the privilege of conducting activities within the forum so that the defendant may reasonably anticipate being haled into court there. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474-75 (1985) (citing *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 295 (1980)). Specific jurisdiction requires only a minimum of contacts, but it requires that the controversy be related in some way to the defendant's contact with the forum. *Burger King Corp.*, 471 U.S. at 472. "[S]pecific jurisdiction requires that the suit 'arise out of' or 'be

related to' [defendant's] minimum contacts with the forum state." *Steel Warehouse v. Leach*, 154 F.3d 712, 714 (7th Cir. 1998) (citing *Helicopteros Nacionales de Colombia v. Hall*, 466 U.S. 408, 414 n.8 (1984)).

Upon finding that a defendant has the requisite minimum contacts with Indiana, the Court must then consider "the quality of those minimum contacts in light of several factors to determine whether the district court's exercise of personal jurisdiction over [the defendant] violates notions of 'fair play and substantial justice.'" *Andersen*, 57 F.Supp.2d at 661 (citing *Burger King Corp.*, 471 U.S. at 476). The fairness factors include: (1) the burden on the defendant of litigating in a foreign forum; (2) the forum state's interest in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the several states in furthering fundamental substantive social policies. *Burger King Corp.*, 471 U.S. at 477. A sliding scale is applied, such that "[w]here the contacts with the forum state demonstrating that the defendant purposefully availed itself of the forum are strong, a lower showing of fairness suffices to permit personal jurisdiction." *Andersen*, 57 F.Supp.2d at 661.

### III.
#### DISCUSSION

In support of his Motion to Dismiss, Mr. O'Neil argues that the Court does not have specific personal jurisdiction over him because his activities were not purposefully directed at Indiana and because requiring him to litigate in Indiana would offend traditional notions of fair play and substantial justice. [Dkt. 41 at 10-13.][5] Specifically, Mr. O'Neil argues that Mr. Mathioudakis' claims relate to allegedly false representations that were made to him prior to execution of

---

[5] Mr. O'Neil also argues that the Court does not have general personal jurisdiction over him, [dkt. 41 at 9-10] which, as noted above, Mr. Rondel concedes is the case, [dkt. 46 at 2].

the Note regarding the wire transfer from a foreign investor, and that Mr. Mathioudakis alleges that Mr. Rondel – not Mr. O'Neil – made those statements. [*Id.* at 10.] Mr. O'Neil asserts that he was not involved in the procurement of the Note, did not have any communications with Mr. Mathioudakis prior to the Note, and any communications between Mr. O'Neil and Mr. Mathioudakis related to payment for the past due Note. [*Id.* at 11.] Mr. O'Neil submitted an affidavit to support his version of the events surrounding his communications with Mr. Mathioudakis and Mr. Rondel. [Dkt. 40-1.]

In his response to the Motion to Dismiss, Mr. Rondel argues that Mr. O'Neil had "multiple contacts with Mr. Mathioudakis in Indiana in furtherance of obtaining a personal loan from him," and that he has been harmed by Mr. O'Neil in Indiana because Mr. Mathioudakis has sued Mr. Rondel based on what Mr. O'Neil has told Mr. Mathioudakis. [Dkt. 46 at 13.] Mr. Rondel submitted an affidavit in support of his response, which sets forth his version of events. [Dkt. 45-1.]

In reply, Mr. O'Neil argues that many of Mr. Rondel's factual contentions lack evidentiary foundation, submits another affidavit, and also argues that the allegations against him relate only to actions in his capacity as an agent of CCC so the fiduciary shield doctrine prevents the exercise of personal jurisdiction over him. [Dkts. 52 at 4-9; 52-1.]

As is evident from the briefing of the Motion to Dismiss, Mr. Rondel and Mr. O'Neil presented differing versions of the events leading up to Mr. Mathioudakis' agreement to enter into the Note, and their involvement in procuring that agreement. The Court therefore conducted and evidentiary hearing to sort through the evidence. Much of the testimony and evidence presented at the evidentiary hearing related to the merits of the claims, which is not relevant at this

stage of the litigation.[6] Instead, the Court is only concerned with Mr. O'Neil's contacts with Indiana, and not with who induced Mr. Mathioudakis to enter into the Note. Because Mr. Rondel and Mr. O'Neil presented such conflicting versions of events in their affidavits, the Court will focus on the undisputed testimony and evidence presented at the hearing.

The Court notes that Mr. O'Neil adamantly denies making any representations to Mr. Mathioudakis about CCC receiving the $ 2 million from a foreign investor, and Mr. Mathioudakis appears to corroborate Mr. O'Neil's version in his deposition. Mr. O'Neil does, however, admit to the following contacts with Mr. Mathioudakis while Mr. Mathioudakis was in Indiana:

- Mr. O'Neil testified that sometime before April 25, 2006, Mr. Mathioudakis called Mr. O'Neil to discuss the terms of the Note. Mr. O'Neil then sent Mr. Mathioudakis an email on April 25, 2006 stating "I need you to clarify the terms" of the Note, and "thanks for your feedback…";

- Mr. O'Neil testified that he called Mr. Mathioudakis back on April 28, 2006 to confirm that Mr. Mathioudakis had sent payment according to the Note. Mr. O'Neil sent Mr. Mathioudakis an email that same day stating "[t]hanks for the follow up. Yes, Steve has agreed to these terms. I have prepared a note for his signature based on these terms, which he will sign on Monday and I will fax to you. I will give you a call to confirm. Please provide the banking confirmation…";

- Mr. O'Neil telephoned Mr. Mathioudakis sometime after sending the April 28, 2006 email, and had a two to three minute conversation in which Mr. Mathioudakis stated that he and Mr. Rondel were working out the details of the Note;

- On May 8, 2006, Mr. O'Neil emailed Mr. Mathioudakis and stated that Mr. Rondel was trying to get back to him;

---

[6] For example, Mr. O'Neil submitted excerpts from Mr. Mathioudakis' deposition, wherein Mr. Mathioudakis testified regarding the substance of the conversations he had with Mr. O'Neil. Mr. Mathioudakis disputes that Mr. O'Neil made any representations to him about the foreign investor. After the hearing, with the Court's approval, Mr. Rondel submitted additional excerpts from Mr. Mathioudakis' deposition, and Mr. O'Neil then submitted counter-designations. For purposes of the pending Motion to Dismiss, however, the specific representations Mr. O'Neil made to Mr. Mathioudakis are irrelevant. The Court's focus is on the fact that the conversations related generally to the Note.

- Mr. O'Neil initiated an email chain on May 10, 2006 stating that he passed on the issue of finalizing the Note to Mr. Rondel, and Mr. Rondel was trying to schedule a time to discuss it with Mr. Mathioudakis;

- In July 2006, Mr. Mathioudakis called Mr. O'Neil to ask about the status of the $2 million loan; and

- On October 31, 2006, Mr. O'Neil received a copy of an email from Mr. Mathioudakis to Mr. Rondel stating that "[a]s you know, I made these loans in GOOD FAITH on the basis of the representations you and Mike made about the $2 M loan which was DEFINITELY coming."

There are many unresolved fact issues surrounding the conversations that Mr. Rondel and Mr. O'Neil had with Mr. Mathioudakis, and what exactly Mr. Mathioudakis was told regarding the foreign investor. But those fact issues are irrelevant at this stage of the litigation. The Court's focus is on Mr. O'Neil's contacts with Indiana, and, while denying that he made any representations to Mr. Mathioudakis regarding the foreign investor, he has testified to the seven contacts listed above. As discussed below, the Court finds that these contacts are enough to confer specific personal jurisdiction under Indiana's long-arm statute, and exercising personal jurisdiction would not violate constitutional due process standards or offend traditional notions of fair play and substantial justice.

**A. Indiana's Long-Arm Statute**

First, Indiana Trial Rule 4.4(A) confers personal jurisdiction for any "action arising from...[d]oing any business in this state…." Mr. O'Neil's testimony, which is corroborated from several email messages, shows a pattern of communication between Mr. O'Neil and Mr. Mathioudakis regarding the Note. The Court makes no findings regarding the substance of those communications, other than to find that they related to the Note and so are relevant contacts for the personal jurisdiction analysis here. These conversations indicate that Mr. O'Neil was "doing business" in Indiana through his dealings with Mr. Mathioudakis.

### B. Constitutional Due Process Standards

Second, exercising personal jurisdiction over Mr. O'Neil comports with due process standards. The Court notes at the outset that while some of the third-party claims relate in part to representations Mr. O'Neil allegedly made to Mr. Rondel – which presumably occurred in Washington and not in Indiana – they primarily relate to Mr. O'Neil's contacts with Mr. Mathioudakis. For example, Mr. Rondel's breach of fiduciary claim against Mr. O'Neil relates to his "duty to [CCC] and to [Mr.] Rondel as a co-corporate officer, to *deal honestly with potential investors*, and with [CCC] and [Mr.] Rondel, in a manner that would not subject [CCC] or [Mr.] Rondel to liability [for] claims for wrongful conduct."  [Dkt. 25 at 17, ¶ 5 (emphasis added).] The defamation claim against Mr. O'Neil alleges that *Mr. O'Neil told Mr. Mathioudakis* that Mr. Rondel made false statements to Mr. Mathioudakis in order to obtain Mr. Mathioudakis' loan. [*Id.* at 19, ¶ 26 (emphasis added).] And, while the fraud claim against Mr. O'Neil appears to focus on the allegation that "all statements made to [Mr. Mathioudakis] about obtaining the loan were based solely on what [Mr. Rondel] had been told by [Mr.] O'Neil and should any of said statements be proven untrue, [Mr.] O'Neil and not [Mr.] Rondel should be liable for the results of those statements having been made," [*id.* at 20, ¶ 28], it is likely that statements Mr. O'Neil made directly to Mr. Mathioudakis will be also be relevant. In short, analysis of these claims will necessarily involve considering evidence regarding Mr. O'Neil's conversations with Mr. Mathioudakis. So, while Mr. O'Neil argues that the third-party claims relate only to a dispute between two Washington citizens, Mr. O'Neil's contacts with Mr. Mathioudakis – which indisputably occurred while Mr. Mathioudakis was in Indiana – actually form the basis of the third-party claims.

Mr. O'Neil purposefully availed himself "of the privilege of conducting activities in Indiana and invoked the protections of Indiana law," *Andersen*, 57 F.Supp.2d at 659, when he communicated with Mr. Mathioudakis, who was in Indiana. *See Burger King Corp.*, 471 U.S. at 473 ("[W]e have emphasized that parties who 'reach out beyond one state and create continuing relationships and obligations with citizens of another state' are subject to regulation and sanctions in the other State for the consequences of their activities") (quoting *Travelers Health Ass'n v. Virginia*, 339 U.S. 643, 647 (1950)); *Woodmar Coin Center, Inc. v. Owen*, 447 N.E.2d 618, 621 (Ind. Ct. App. 1983) (defendant purposefully availed himself of benefits and responsibilities of doing business in Indiana when he made two phone calls to plaintiff in Indiana to initiate a relationship, and negotiated and formed a contract with the Indiana plaintiff). Because Mr. O'Neil's contacts with Mr. Mathioudakis were deliberate and were "related to the basis of the claim[s]" against Mr. O'Neil, *Breneman v. Slusher*, 768 N.E.2d 451, 461 (Ind. Ct. App. 2002), exercising personal jurisdiction over Mr. O'Neil comports with due process here.

### C.  Traditional Notions of Fair Play and Substantial Justice

Finally, the Court finds that exercising personal jurisdiction over Mr. O'Neil would not offend traditional notions of fair play and substantial justice – which include the burden on Mr. O'Neil of litigating in Indiana, Indiana's interest in adjudicating the dispute, Mr. Rondel's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of the controversies, and the shared interest of the several states in furthering fundamental substantive social policies. *See Burger King Corp.*, 471 U.S. at 477.

First, while Mr. O'Neil will face a burden litigating outside of his home state and in Indiana, he has not submitted any evidence indicating that such a burden would violate due process. Additionally, modern technology and modes of transportation make this factor less relevant. *See*

*Burger King Corp.*, 471 U.S. at 474 (modern transportation and communication lead to conclusion that it is not usually unfair or too burdensome for party to defend itself in a state where it conducts business); *Bd. of Trustees, Sheet Metal Workers' Nat'l Pension Fund v. Elite Erectors, Inc.*, 212 F.3d 1031, 1037 (7th Cir. 2000) ("Easy air transportation [and] the rapid transmission of documents…make it easy these days for cases to be litigated with little extra burden in any of the major metropolitan areas").  Second, while Mr. O'Neil characterizes the third-party claims as disputes between two Washington citizens, about a Washington corporation, and in which Indiana has no interest, the Court disagrees.  As discussed above, the basis for the third-party claims lies in the contacts Mr. O'Neil had with Mr. Mathioudakis.  Those contacts indisputably took place while Mr. Mathioudakis was in Indiana, so Indiana has a direct interest in resolution of the third-party claims.  Third, the third-party claims are so related to the first-party claims that resolving them in the same litigation furthers Mr. Rondel's interest in obtaining convenient and efficient resolution of the controversy, and promotes the judicial system's goal of obtaining the most efficient resolution of controversies.[7]  Finally, there is no indication that the exercise of personal jurisdiction here would undermine any substantive social policies.  In sum, the Court finds that exercising personal jurisdiction over Mr. O'Neil does not offend the traditional notions of fair play and substantial justice.

### D.  The Fiduciary Shield Doctrine

Mr. O'Neil's final argument, which he makes for the first time on reply, is that the Court cannot exercise personal jurisdiction over him based solely on his actions as an agent of CCC under the fiduciary shield doctrine, which he argues "'precludes a state from exercising jurisdic-

---

[7] The Court has already found in connection with its exercise of supplemental jurisdiction over Mr. Rondel's third-party claims that those claims are "'so related to'" claims that Mr. Mathioudakis asserts against Mr. Rondel that "'they form part of the same case or controversy under Article III of the United States Constitution.'  28 U.S.C. § 1367(a)."  [Dkt. 38 at 2.]

tion over an individual sued in his or her personal capacity if the only basis for jurisdiction is his or her contacts with the forum in which he or she was acting solely as a fiduciary of a corporation.'" [Dkt. 52 at 9 (quoting *Intermatic, Inc. v. Taymac Corp.*, 815 F.Supp. 290, 293 (S.D. Ind. 1993)).]

Arguments raised for the first time on reply are generally waived. *See Griffin v. Bell*, 694 F.3d 817, 822 (7th Cir. 2012); *Hendricks v. New Albany Police Dep't*, 749 F.Supp.2d 863, 872 (S.D. Ind. 2010). In any event, the Court finds that the fiduciary shield doctrine does not bar it from exercising personal jurisdiction over Mr. O'Neil. While the Indiana Supreme Court has not explicitly ruled on whether the fiduciary shield doctrine applies in this context, several district courts sitting in Indiana have held that "the fiduciary shield doctrine cannot be asserted to defeat personal jurisdiction in Indiana." *See, e.g.*, *Intermatic, Inc.*, 815 F.Supp. at 296.

As the *Intermatic* Court explained, "the fiduciary shield doctrine limits the jurisdictional reach of a state to less than that which is allowed by due process….Thus, application of the fiduciary shield doctrine would be contrary to the well-established interpretation given to Indiana's long-arm statute." *Id*. *See also Wine & Canvas Dev., LLC v. Weisser*, 886 F.Supp.2d 930, 941 (S.D. Ind. 2012); *CR3 of Ind., LLC v. Specialty Surfaces Int'l, Inc.*, 2008 U.S. Dist. LEXIS 63537, *5-6 (S.D. Ind. 2008) ("This court agrees with earlier decisions in this district predicting that the Indiana Supreme Court would reject the [fiduciary shield] doctrine"); *Huber v. House*, 2004 U.S. Dist. LEXIS 26718, *8-9 (S.D. Ind. 2004); *Health Management Professionals v. Diversified Business Enters.*, 882 F.Supp. 795, 799 (S.D. Ind. 1995). Mr. O'Neil's fiduciary shield argument is unavailing.

## IV.
### CONCLUSION

For the foregoing reasons, Third-Party Defendant Michael O'Neil's Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(2), [dkt. 40], is **DENIED**.

11/05/2013

*Jane Magnus-Stinson*
Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only:**

Thomas K. Caldwell
MADDOX HARGETT & CARUSO, PC
tkcaldwell@mhclaw.com

Timothy John Kirk
MADDOX HARGETT & CARUSO, PC
kirktjohn@mhclaw.com

Mark E. Maddox
MADDOX HARGETT & CARUSO, PC
mmaddox@mhclaw.com

Robert W. York
ROBET W. YORK & ASSOCIATES
rwyork@york-law.com

**Distribution via U.S. Mail only:**

MICHAEL O'NEIL
6531 152nd Ave.
Bellevue, WA 98006